Anthony J. Di Gtovanna, J.
This is an action to recover on a fire insurance policy which insured the plaintiff “to an amount not exceeding * * * ($20,000) * * * to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair.”
The defendant has submitted 26 requests to find. A number hereinafter appearing in parenthesis is the number of such request and the decision with respect thereto follows.
In this case it is necessary that the court make a finding as to which is the lesser amount, that is, the “ actual cash value ” or “ cost to repair ” because defendant’s liability is predicated on whichever is the lesser amount, limited, however, by the amount of the policy.
The following facts have been admitted in the answer: (1) That the plaintiff was and still is a domestic corporation duly organized and authorized to do business in the State of New York; (2) that at all times hereinafter mentioned, the defendant was and still is a domestic corporation duly organized and authorized to conduct an insurance business in the State of New York; (5) the issuance of a policy; (6) that said policy of insurance and indorsements thereto was issued and delivered by defendant for a good and valuable consideration paid to defendant by the plaintiff; (7) among other things, said policy of insurance insured plaintiff against damages resulting from *830 fire to the plaintiff’s aforesaid building situate at 890 Hancock Street, Brooklyn.
In the defendant’s request to find, the defendant admits: (3) the ownership by plaintiff of 890 Hancock Street, Brooklyn.
It was stipulated at the trial that: (8) in addition to the policy referred to plaintiff had another fire insurance policy covering loss by fire in the amount of $20,000; (9) that on or about January 19, 1959, while the said policy was in effect a fire occurred at 890 Hancock Street, which damaged the building; and (20) that plaintiff received from the other insurance company the sum of $12,000 in settlement of its claim against that insurance company only.
The extent of the damage has been sharply contested. Plaintiff’s Exhibit 3 contains a list of almost 100 items of damages to various parts of the building. It was introduced into evidence during the testimony of Frank Olshansky, an expert called by the plaintiff, subject to cross-examination by the defendant with respect to any items. Defendant’s Exhibit B was a list introduced into evidence during the testimony of Raymond Eisenhauer an expert called by the defendant. The total estimated cost of repairs set forth in Exhibit B was $26,563.45, plus $3,984.52, representing an allowance to the builder for his profit and overhead, making a total of $30,547.97. For unexplained reasons the defendant excluded from such estimate the following items: emergency and temporary work; floor coverings; window shades or Venetian blinds; damage due to vandalism or theft; further damage due to exposure to the elements; interior painting, gas ranges or refrigerators, dumbwaiter installation, kitchen and bathroom fixtures, bell wiring.
Plaintiff’s Exhibit 3 sets forth a total of $33,702.10 as an estimated cost of repairs plus the amount of $6,740.42 representing an allowance to the builder for profits and overhead, making a total of $40,442.52. The defendant has offered proof of depreciation in an attempt to reduce the repair estimate by the sum of $6,330.62. That amount was increased by the sum of $949.59, representing 15% overhead and profit to the builder. There is no relation between the depreciation item and the profit and overhead item to the builder. That item of $949.59 should never have been included in the list.
The subject of depreciation with respect to “ cost of repair ” was fully discussed in Lazaroff v. Northwestern Nat. Ins. Co. (121 N. Y. S. 2d 122, affd. 281 App. Div. 672) wherein the court said at page 123: ‘ ‘ The court is of the opinion that the defendant’s obligation in respect of repairs is to reimburse the plaintiff *831 for the cost of repairs with materials of the kind and quality damaged without deduction for depreciation. Boskowitz v. Continental Ins. Co., 175 App. Div. 18, 161 N. Y. S. 680; Andrews v. Empire Cooperative Fire Ins. Co., Sup., 103 N. Y. S. 2d 177. The submission executed by the parties dated June 6, 1951 provides for the ascertainment of the cash value of the property ‘with proper deductions for depreciation[’] but does not provide for deductions for depreciation as to the ‘ cost to repair or replace.’ ” While it is true that the arbitration submission was strictly construed therein, so should the insurance policy be in our case. Unlike the policy in the McAnarney v. Newark Fire Ins. Co. (247 N. Y. 176), the policy in the instant case omits the words “ascertain with proper deductions for depreciation” which appeared in the policy in the McAnarney case. Those words have now been excluded from the standard form of policy.
In Andrews v. Empire Co-op. Fire Ins. Co. (103 N. Y. S. 2d 177, 182) the court said: “ On the matter of the cost of replacement, the plaintiffs and defendant are again at odds in their contentions. Plaintiffs’ contention is that they are entitled to be reimbursed for the value of new material. The defendant’s contention is that the new material must be depreciated so as to equal the value of the material as it was in the house immediately prior to the fire. Regarding a like contention are some very interesting notes in Yol. 49, Columbia Law Review, Part 2, Page 818. The trend of thought in such notes is favorable to the contention of the defendant, but so far as the case at bar is concerned, I do not agree with such trend of thought. The words ‘ kind and quality ’ connote to me the type of material, i.e.: whether brick, stone, wood, etc., and grade or class of material as formerly used in the building. It does not mean depreciated material. * * * Moreover, I find that with the use of new material the plaintiffs would have no better building than they had prior to the fire, and, in fact, the proof is that the building would lack certain materials and facilities which were a part of the building when the fire occurred.”
I have considered the respective gross amounts claimed by the plaintiff (Ex. 3) as against the concession of the defendant (Ex. B) in the light of the defendant’s contention that the destruction was not complete nor nearly complete. Some pertinent differences are set forth. The plaintiff claimed in its general items: ‘ ‘ plastering walls and ceilings, first, second and third floor, $11,499.” The defendant sets forth an item entitled: “ masonry and plastering $10,268.50.” The court’s reconcilia *832 tion of the figures computes the total items of plastering set forth in the defendant’s Exhibit B as $9,563.10. Therein lies a difference of approximately $2,000. The reason is apparent. The defendant concedes that there are 45 separate ceilings that required complete replastering, 5 walls required 80% plastering ; one half of the walls in 9 instances; 3/4 of the walls in 2 instances; plus 1/3 of the walls in 5 instances; 2/3 of the walls in one instance; and 1/4 plastering of the ceilings in one instance. Examination of the photographs submitted as defendant’s Exhibit 1 indicate to me that the defendant has not fairly computed this item of damage where 23 rooms have been so completely gutted as to require complete plastering of ceilings and walls and all of the remaining areas require complete plastering of the ceilings; and almost complete plastering of the walls; it is, indeed, farfetched to find that only 80% of the walls in some of those rooms require replastering and in some instances 3/4. Where 80% of the plastering of the walls was destroyed by the fire, the destruction is for all practical purposes complete. No one reconstructing the building would consider leaving the scarce amount of old plaster under those circumstances.
Another item in dispute is that appearing on page 9 of Exhibit B wherein it is noted “we do not include * * * interior painting.” Plaintiff’s Exhibit 3 claims a painting item in the sum of $2,295. It is not clear why the defendant has excluded from its consideration such an item.
The defendant has conceded that in respect to the roof, it must be completely recovered with lumber and roofing materials. In each instance its specific figures are much less than those contained in the plaintiff’s list. In many instances where plaintiff claims that doors and sash have to be completely replaced, defendant has contended that only repairs need be made. The court has examined the pictures and concludes that the interest of public safety require replacement of most of these items.
Under the circumstances the court finds that the fire damage set forth in plaintiff’s Exhibit 3 is the damage sustained to the building and not that in defendant’s Exhibit B.
The defendant, of course, is not compelled to pay for the cost of replacement or repair to the building if as a fact the actual cash value of the property at the time of loss was less than the cost of replacement. Defendant contends that the plaintiff is not entitled to a judgment herein because it actually suffered no damage. He bases that argument upon the fact and so the court finds that (4) “ said premises were purchased by the plain *833 tiff in September, 1958 from Lahrs Realty Corporation for a consideration of $22,500, which is the same price paid by Lahrs Realty Corporation to the vendor.” It has been testified to and the court so finds that (19) “ plaintiff sold the land and building after the fire for $12,000.” The court finds (21) that ‘ ‘ the total received by plaintiff on the resale and from the other insurance carrier was $24,000, which equals the amount paid by it for the building to its vendor Lahrs Realty Corporation 4 months before the fire.” Defendant contends that under the McAnarney case (supra) (26) “ plaintiff having been reimbursed to the extent of $12,000 upon resale of the property after the fire and by an additional $12,000 received from the American & Foreign Insurance Company, making a total of $24,000, which is in excess of the actual cash value of the property before the fire, has suffered no loss indemnifiable under defendant’s policy of insurance.” That request to find is denied. While the court makes such findings of fact, the court does not agree with the legal argument made by the defendant. It would follow from defendant’s argument that a plaintiff who did not sell the property until after the policy loss was paid, would be legally bound to pay such amount over to the insurance company. No such rule of law has been shown to the court. Actual loss under a fire insurance policy is not limited to the price paid by the owner for the property nor for the price for which it is sold. One may pay a cheap price for an expensive building and be entitled to be reimbursed not for what he paid for the building, but for what the actual value of the building is as a going proposition or as a potentially successful project.
It is a conceded fact that the premises were vacant for about one week before the fire; also, that (13) the plaintiff’s predecessor had filed plans and specifications with the Building Department of the City of New York for conversion of this building from a 6-story apartment building to a 12-story apartment building with central heat and hot water to meet the requirements of section D26-3.10 of the Multiple Dwelling Code (Administrative Code of City of New York, § D26-3.10). There is no question but that (10) “ the premises consisted of a 3 story building over 50 years old, containing six apartments of six rooms and bath, each without central heat or hot water and known as cold water flats.” Under section D26-3.10 of the Multiple Dwelling Code, the plaintiff (11) was required to alter the building to include heat and hot water, the deadline being November 1, 1959. Without such alteration the building could not be occupied after November 1? 1959, There can be no quarrel *834 concerning that requested finding of fact. However, the defendant has requested that the court make the following specious finding of fact: (12) “The building was obsolete in view of its age and the aforementioned requirements of the Multiple Dwelling Code. ’ ’ The court disagrees with that request and denies it. The testimony of Herbert Schwartz distinguished this building from other buildings of like age and use. He contended that this building, and the court so finds, was different in that no apartment therein was of the “ railroad ” type of flat, that each room had windows opening to the outside light and air, that the apartment and the house were well kept and well maintained and that the house was readily able to be converted to useful property by the addition of a central heating plant and hot water. A building does not become obsolete merely because a change in law requires the addition of a preferred facility for the tenants. Public legislation can only require the addition of such facilities; they cannot destroy the value of the property. Mr. Schwartz testified that the plaintiff had intended to file its own plans for the mere addition of central heating and hot water leaving the six-room apartment intact because (14) “ plaintiffs did not wish to engage in such extensive alteration plans, and merely wanted to install heat and hot water, leaving the six-room apartment as is. In anticipation of this plaintiff removed all the tenants from the building in the early part of January about 2 weeks before the fire.” The court makes such finding. According to Mr. Schwartz, who was a real estate appraiser and completely experienced in the buying, selling and maintaining of properties and one who had done at least 50 renovations and who had been a 50% owner of plaintiff’s predecessor and managed it, the building was completely occupied and the rent roll averaged about $50 per apartment. He said that no two buildings on the block were alike. Each building was handled and maintained differently. It was his opinion that any other building on this block was worth 10% of the value of this particular building because this building had windows on all four sides and alleys on all four sides. The building had windows in every single room and the bathrooms had windows. There were not any dark bathrooms with ducts or with shafts going to the roof. The walls had cove moldings and fancy molding forms around the center where chandeliers were set. Each room in the building was similarly outfitted.
The testimony of Mr. J. E. Hickey, an expert called by the defendant differed sharply from that of Mr. Schwartz. How *835 ever, the court places no value on his testimony. While he had had extensive training as a real estate appraiser covering a span of 41 years and he said he was familiar with sales and purchases of buildings in the immediate vicinity, it was apparent that his knowledge of the sales and of the buildings sold came from a publication known as “ The Register.” His knowledge of the layout of the building came from a study of the 1925 Desk Atlas of the Borough of Brooklyn. He knew that the general nature of the buildings on the block were that of cold-water flats. He further testified his valuation of the building on the fair rental value of the six apartments at $27 without actually knowing anything about the actual rent rolls of this particular building.
He conceded that he had never seen this building in particular before December 15, 1959, almost 11 months after the fire and at a time when the building had been almost completely renovated by the grantee of the plaintiff. Therefore, he came to a conclusion (15) that the actual cash value of the building before the fire was $15,000. It is interesting to note that this differs radically from the “ approximate replacement cost — $53,500 ” appearing on Exhibit B as part of Eisenhauer’s report. The court does not agree with Mr. Hickey’s estimate. His knowledge of the facts concerning this building was so incomplete as to make it worthless. On the other hand, Mr. Schwartz, who was an interested witness, testified concerning the condition of the building and the rental roll. Based upon that he said that the sound value before the fire of the building was $50,000 which he arrived at by computing the cubic feet at 48,600, multiplied by $1 to $1.05 per cubic foot as of the time of the fire loss. His testimony was that a building of this kind could not be replaced for less than that figure. While it is true that the assessed value of the building was $6,450, the land $3,050, that factor in and of itself is not decisive of the sound value or cash value of the building. The court disagrees with the requested finding that (18) “ similar buildings, including land on the same block were sold between 1956 and 1958 at prices ranging between $8,000 and $12,000 ” because the description of the interior of those buildings, the condition of them, the quality of them, were not bolstered by any testimony other than that given by Mr. Hickey by reading the 1925 Desk Atlas and “ The Register.” There has been no proof that the buildings were similar and, as a matter of fact, the testimony shows that those buildings contained railroad flats as distinguished from the building at issue; further, that those buildings did *836 not have rooms with windows facing the outside as in this building; further, that this building was considerably larger in size than the other buildings. Frank Olshansky, who had testified as the plaintiff’s expert, defined the word “ sound value ’ ’ as meaning the insurable cash value of the building. It was his opinion that the insurable cash value of the building was approximately $55,000. It was his opinion that the figure submitted by him would be the amount that it would cost to replace the condition of the building as it was prior to the fire. The $55,000 figure would be that required to build a new three-story, six-family apartment house on that site not including the cost of foundation but including the cost of the four outer walls. He said that the brick walls of the building had been damaged where the beams had been gutted and that that damage is reflected in his report in the items called brickfill and brickwork.
Mr. Olshansky was interested witness to the extent that he stood to gain 10% recovery therein as his fee. (23) However, the testimony of Mr. Eisenhauer, the defendant’s expert, did not reflect any finding that Mr. Olshansky had exaggerated the extent of the damage and rather confirms his opinion.
Therefore, the request that the court make a finding that this building was obsolete is without merit. We are all familiar with the fact that many theatre buildings were abandoned following the advent of television and of its adverse effect upon cinemas. They were not destroyed or torn down; many useful purposes were found for those buildings at a fraction of the cost which a new building Avould have cost. The conversion of theatre buildings to factories, sanitariums, television studios, stores and other uses is well known. The law did not intend the compulsory obsolescence of apartment buildings such as this by the requirement that central heating be installed. The law favors renovation. Public housing needs are such that developers and builders must be encouraged to convert old buildings. Living space must be provided for the poorly paid as well as the affluent. Such conversions do not mean obsolescence.
In the McAnarney case (supra) seven large buildings designed for the manufacture of malt had become useless for that purpose by reason of the Prohibition Act of 1918. Thereafter, the buildings ceased to be employed for any useful purpose. Even in that case the court refused to find the buildings to be obsolete. In our case the building was only temporarily unusable, but able to be used for the same use it had before the fire by the addition of central heating. In that case plaintiff was the contract vendee of the premises for $8,000. In January, 1920 *837 policies of insurance were issued insuring the owner and the plaintiff, as their interest might appear, in the sum of $42,750; in April, 1920, the buildings were destroyed by fire. Plaintiffs served proof of loss in the sum of $2,500. The jury found that the intrinsic or depreciated structural value of the buildings burned was $55,000. However, because the court refused to receive proof that the plaintiff as a director of the owner in 1919 had reported to the company that he had been unable to obtain a purchaser for the property, that in 1919 the corporation contracted to erect a sign advertising the property for sale for $12,000; that an affidavit was filed by the plaintiff in 1919 with the Board of Assessors, in which the property was claimed to have no value except for the production of malt, which had ceased, the owners would accept $15,000 for the property even though the best ever received up to that time was $6,000 and because the trial court erroneously charged the jury, the Court of Appeals reversed the jury verdict saying that important items to be considered in determining “ cash value ” had been kept from the jury. The court charge that a jury finding as to intrinsic value or depreciated structural value should be limited only to what it would cost to build the structure less depreciation and not market value was held to be error. In discussing this question of actual value the court said (p. 181): “ Insurance is thereby limited to ‘ actual cash value (ascertained with proper deductions for depreciation) of the property at the time of loss or damage. ’ Value ascertained by market price is necessarily expressive of a suitable deduction for depreciation. If ‘ actual cash value ’ were synonymous with ‘ market value ’ the words in parentheses, to have force, would require depreciation to be twice subtracted. No such anomalous result could have been intended. In order that the parenthetical words should have force, therefore, ‘ actual cash value ’ must be interpreted as having a broader significance than ‘ market value.’ Moreover, if market value were the rule, property, for which there was no market, would possess no insurable value, a proposition which is clearly untenable. We think it manifest that the clause was not intended to restrict a recovery for this insurance loss to the market value of the insured buildings. We interpret1 actual cash value ’ to have no other significance than ‘ actual value ’ expressed in terms of money. For methods by which actual value may be ascertained, we must look beyond the terms of the policy to general principles of the law of damages.”
The court went on to say (pp. 181-182): “No principle, obtaining in the law of damages, requires that the recovery be restricted to the market value of the buildings. True it is that *838 articles of commerce destined for sale must be appraised, to measure loss through conversion or breach of contract, by the market prices at which such articles are bought and sold. The reason for this rule is this: the loser of the article, if awarded the prevailing price therefor, may enter the market and, with the sum awarded, replace the article lost with a substitute identical in kind and quality. Replacement in kind necessarily accomplishes complete indemnity. However, the rule presupposes the existence of a broad market with frequent trading in articles of an identical character with the article lost. * * * It must be a market in which the loser ‘ could have replaced the goods. ’ * * * It must show £ what would be the value to a party if he wanted to get the same articles again. ’ * * * It must enable the loser to £ supply himself with this article by going into the market and making his purchase at such price.’ * * * í Market value, ’ as an exclusive measure of damages, necessarily involves identity of concept as disclosed by frequency of sale. ‘ Proof of a single sale is not enough to establish a market value. ’ (Sedgwick [Damages], sec. 244.) Clearly, where no sales have been made, the opinion of an expert that the property in question ‘ will sell ’ for a given sum does not establish ‘ market value,’ in the sense of an exclusive criterion of value.”
The court went on to discuss that there was no established market value for certain items because the value of such items depends upon the accidents of form, agent and material. A luxurious private yacht, though marketable in the sense that it could be sold, has no market value. The court, quoting from The H. F. Dimock (77 F. 226, 235) said (p. 183): ££ £ She does not fall within the class of articles which are sold from day to day, so that frequent current market transactions will enable the owner, if he desires to sell, to obtain, within a reasonable time, a fair value, or, if he is compelled to replace, to replace at a like fair value.’ ” Self-evidently, the buildings which are the subject of this action, have no £ £ market value ” in a strict sense. In the first place, buildings, independently of the land upon which they stand, are never the subject of market sales. In the second place, no two buildings are alike in size, proportion, ornamentation or otherwise. Doubtless no buildings, duplicating those destroyed, could be found the world over. They are incapable of replacement from any market whatsoever. Therefore, the strict rule that market value or market price is an exclusive measure of damage does not apply.
The plaintiff had contended that the sole measure of damage was the cost of reproduction less physical depreciation. The *839 court disagreed with the plaintiff’s contention, saying that those words merely grant a privilege to the insurer. The insurer had an option, if it so elected, to reconstruct the destroyed buildings upon their ancient pattern with buildings of like kind or quality, or pay the assured the necessary cost of such reconstruction. If the insurer so elected, it could be allowed nothing for the difference between the value of the old and the new buildings. The court held that this clause does not constitute an exclusive measure of recovery.
The court went on to say (pp. 184-186): “ Indemnity is the basis and foundation of all insurance law. * * * The insurer, in our case, in its contract with the plaintiff stipulated that it ‘ does insure ’ the plaintiff 1 to the extent of the actual cash value. ’ Under our interpretation of the phrase, the insurer ‘ does insure ’ to the limit of actual value. * * * Where insured buildings have been destroyed, the trier of fact may, and should, call to its aid in order to effectuate complete indemnity, every fact and circumstance which would logically tend to the formation of a correct estimate of the loss. It may consider original cost and cost of reproduction; the opinions upon value given by qualified Avitnesses; the declarations against interest which may have been made by the assured; the gainful uses to which the buildings might have been put; as well as any other fact reasonably tending to throw light upon the subject. * * * An obsolete thing is a thing no longer in use. In determining the extent to which these buildings had suffered from depreciation the trier of fact should have been permitted to consider that, owing to the passage of the National Prohibition Act, they were no longer useful for the purposes to serve for Avhich they where erected. It should have been permitted to consider their adaptability or inadaptability to other commercial purposes. * * •* Doubtless the law should similarly discriminate between buildings used and usable for commercial purposes and buildings used and usable for residence purposes. * * * It might well be held that handsomely carved woodwork or other ornamental features, Avhen found in a private home, have insurable value; Avhereas, when found in a factory, since they are not useful for factory purposes they have no such value.”
In Sebring v. Firemen’s Ins. Co. of Newark (227 App. Div. 103) an action was brought to recover on a fire insurance policy. Like the McAnarney case (supra) the fire insurance policy contained the clause “ to the extent of the actual cash value (ascertained with proper deductions for depreciation) of the *840 property at the time of loss or damage, but not exceeding the amount which it would cost to repair or replace the same with material of like kind and quality within a reasonable time after such loss or damage.” The court said (p. 104): “ Cost of reconstruction of the burned buildings, less depreciation, is one of the elements which go to make up 1 actual value.’ It is not, however, the exclusive and only method by which that value can be ascertained. The trier * * * is entitled to consider for what it is worth any fact which reasonably tends to throw light upon that subject. This would include the purchase price of the property, if it was bought within a reasonable period prior to the fire, the opinion of experts as to its value, etc. Possibly these facts would have little or no weight with the jury; but they are entitled to this information and can give it such weight as they deem proper. * * * The jury could have taken into account any fact reasonably tending to shed any light on the question. ’ ’
In Lazaroff v. Northwestern Nat. Ins. Co. (121 N. Y. S. 2d 122, affd. 281 App. Div. 672, supra) an action was brought upon a fire insurance policy. The premises were purchased by the plaintiff three years before the date of trial for the sum of $7,500. They were assessed for tax purposes at $10,000. The aggregate of fire insurance policies was $15,000. Two appraisers and an umpire ascertained the value of the property at the time of loss to be $41,250, and fire loss and damage to be $3,600. It appeared that the value of $41,250 represented replacement cost of $75,000, less depreciation of $33,750, computed at the rate of 45% of the replacement cost. That value did not reflect the assessed valuation, the market value, the actual cost to the plaintiff nor any other element generally usable in ascertainment of fire losses. The court said (p. 123): “ and is obviously not in accord with recognized judicial criteria for the ascertainment of the actual cash value of the property at the time of the loss, which is the extent of the coverage of the policy in question.”
However, because the parties had stipulated for the appraisal and subjected themselves thereto, the court held that they were bound thereby in the absence of a showing of fraud which was neither alleged nor established.
In Lazaroff v. Northwestern Nat. Ins. Co. (supra [:Sup. Ct., McNally, J., 1952]) it was stated at page 123: “ The court is of the opinion that the defendant’s obligation in respect of repairs is to reimburse the plaintiff for the cost of repairs with materials of the kind and quality damaged without deduc *841 tion for depreciation. Boskowitz v. Continental Ins. Co., 175 App. Div. 18, 161 N. Y. S. 680; Andrews v. Empire Cooperative Fire Ins. Co., Sup. 103 N. Y. S. 2d 177.”
In the case cited the agreed cost of repairs was found to be $4,500 from which depreciation at the rate of 20% or $900 was deducted. The court granted judgment for $4,500 holding deduction for depreciation to be error. The policy says nothing about deduction for depreciation. In construing the phrase “ cost of repairs with materials of the kind and quality damaged ” that does not mean replacing beams or bricks that were 60 years old with beams or bricks that are 60 years old. What that means is that bricks must be replaced by bricks and beams made of wood must be replaced by beams made of wood and not of steel for example. (Andrews v. Empire Co-op. Fire Ins. Co., 103 N. Y. S. 2d 177, supra.)
The Andrews case has been heretofore discussed.
Under the circumstances, the court finds that this building had a cash value to the plaintiff in excess of $50,000. (24) Plaintiff cannot recover any greater amount than the cost of replacement, under the circumstances, which is limited to $40,442.52, less $12,000 already recovered from the other insurance company, or $28,442.52. However, in view of the fact that plaintiff is limited by the policy to recovery of $20,000, judgment is directed in its favor in such sum, with interest.